UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DAWID GRZEGORZ HABRZYK, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | No. 10 C 5830 |
| | ) | |
| BOGUSLAWA MONIKA HABRZYK, | ) | Judge Ruben Castillo |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION AND ORDER

Dawid Grzegorz Habrzyk ("Petitioner") brings this action for the return of his daughter ("Child") to Poland under the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11670, S. Treaty Doc. No. 99-11 ("Hague Convention" or "Convention"), and implemented by the International Child Abduction Remedies Act, 42 U.S.C. § 11601 *et seq.* ("ICARA"). (R. 1, Pet.) Petitioner claims that Respondent, the Child's mother, wrongfully abducted the Child in violation of the Convention and ICARA, and seeks the Child's return to Poland. The Court has given this action expedited treatment, in accord with the Convention, and will continue to do so. Presently before the Court is Petitioner's motion for summary judgment. (R. 43, Pet'r Mot. for Summ. J.) For the reasons stated below, the motion is granted in part and denied in part. The Court will proceed to hold an evidentiary hearing on the issues remaining in this action as outlined herein.

## RELEVANT FACTS[1]

---

[1] The Court takes the undisputed facts from the parties' Local Rule 56.1 Statements. (R. 47, Pet'r Local Rule 56.1 Statement of Material Facts ("Pet'r Facts"); R. 56, Resp't Local Rule 56.1 Statement of Material Facts ("Resp't Facts"); R. 56, Resp't Local Rule 56.1(a) Response to Pet'r Local Rule 56.1 Statement of Material Facts ("Resp't 56.1 Resp.").) Because of the expedited

On April 29, 2006, Petitioner and Respondent were married in Poland. (R. 47, Pet'r Facts ¶ 1; R. 56, Resp't 56.1 Resp. ¶ 1.) To date, they continue to be married. (R. 47, Pet'r Facts ¶ 1; R. 56, Resp't 56.1 Resp. ¶ 1.) On July 28, 2006, the Child was born in Poland. (R. 47, Pet'r Facts ¶ 2; R. 56, Resp't 56.1 Resp. ¶ 2.) Respondent and Petitioner are listed as the mother and father on the Child's Polish birth certificate. (R. 47, Pet'r Facts ¶ 2; R. 56, Resp't 56.1 Resp. ¶ 2.) From July 28, 2006 to April 3, 2009, the Child lived in Poland. (R. 47, Pet'r Facts ¶ 3; R. 56, Resp't 56.1 Resp. ¶ 3.) From around July 28, 2006 through the end of 2007, the Child lived with Respondent, and Petitioner visited occasionally. (R. 47, Pet'r Facts ¶¶ 5-6; R. 56, Resp't 56.1 Resp. ¶¶ 5-6.) Between the end of 2007 through April 2009, Respondent and the Child moved to a new home, where Petitioner visited and would occasionally stay overnight. (R. 47, Pet'r Facts ¶ 6; R. 56, Resp't 56.1 Resp. ¶ 6.) When Petitioner was not living with Respondent and the Child during this period, he occasionally provided groceries and also paid the bills for Respondent and the Child.[2] (R. 47, Pet'r Facts ¶ 9; R. 56, Resp't 56.1 Resp. ¶ 9.) Respondent claims that Petitioner physically and emotionally abused her and the Child, and that Petitioner frequently abused alcohol and drugs. (R. 56, Resp't Facts ¶ 4.)

On April 3, 2009, Respondent left Poland with the Child on a flight to Toronto, Canada. (R. 47, Pet'r Facts ¶ 15; R. 56, Resp't 56.1 Resp. ¶ 15.) Respondent's sister, Izabella Kolasa, had purchased the tickets for Respondent and the Child on March 25, 2009. (R. 47, Pet'r Facts ¶ 14; R. 56, Resp't 56.1 Resp. ¶ 14.) Respondent never discussed with Petitioner that she and the Child planned to leave. (R. 47, Pet'r Facts ¶ 11; R. 56, Resp't 56.1 Resp. ¶ 11.) She believes

---

nature of the proceedings, Petitioner was not given the opportunity to respond to Respondent's Local Rule 56.1 Statement of Material Facts.

[2] The source of the funds used to pay the bills is in dispute. (R. 47, Pet'r Facts ¶ 9; R. 56, Resp't 56.1 Resp. ¶ 9.)

that had Petitioner known of the plans, he would have objected. (R. 47, Pet'r Facts ¶ 12; R. 56, Resp't 56.1 Resp. ¶ 12.)

From April 3, 2009 through April 28, 2009, Respondent and the Child stayed in Canada. (R. 47, Pet'r Facts ¶ 16; R. 56, Resp't 56.1 Resp. ¶ 16.) During this time, Petitioner contacted Respondent's sister, but she did not tell Petitioner that Respondent and the Child were in Canada. (R. 47, Pet'r Facts ¶ 21; R. 56, Resp't 56.1 Resp. ¶ 21.) On April 28, 2009, Respondent and the Child left Canada via a small passenger boat and arrived in the United States. (R. 47, Pet'r Facts ¶¶ 17-18; R. 56, Resp't 56.1 Resp. ¶¶ 17-18.) Petitioner contends that Respondent and the Child did not pass through customs when they entered the United States; Respondent has neither admitted nor denied that allegation. (R. 47 Pet'r Facts ¶ 39; R. 56, Resp't 56.1 Resp. ¶ 39.) Since arriving in the United States, Respondent has not made any attempts to contact Petitioner, and they have not spoken since Respondent and the Child left Poland. (R. 47, Pet'r Facts ¶¶ 19-20; R. 56, Resp't 56.1 Resp. ¶¶ 19-20.)

When Petitioner could not locate Respondent and the Child on April 3, 2009, he went to the police station in Kęty, Poland and reported them as missing persons. (R. 47, Pet'r Facts ¶ 23.) Three days later, the Polish Border Service informed Petitioner that Respondent and the Child had left Poland on a flight bound for Canada. (R. 47, Pet'r Facts ¶ 24.) That same day, Petitioner reported to the police station in Kęty, Poland that Respondent had abducted the Child. (R. 47, Pet'r Facts ¶ 25.) On April 8, 2009, Petitioner initiated judicial proceedings in Poland to establish the whereabouts of the Child and for access to the Child. (R. 47, Pet'r Facts ¶ 26.) In May and June of 2009, Petitioner contacted the Polish Consulate in Chicago and the United States Consulate in Poland seeking assistance in locating the Child. (R. 47, Pet'r Facts ¶¶ 29-

30.)

In the United States, Respondent shares an apartment with the Child and Respondent's mother. (R. 56, Resp't Facts ¶ 9.) She cleans houses and earns between $200 and $250 per week. (R. 47, Pet'r Facts ¶ 40; R. 56, Resp't 56.1 Resp. ¶ 40.) The Child currently does not attend school or daycare, and is taken care of by her grandmother while Respondent works. (R. 47, Pet'r Facts ¶¶ 42-43; R. 56, Resp't 56.1 Resp. ¶¶ 42-43.) According to Respondent, the Child attends church on a weekly basis, plays with her cousins, and engages in activities appropriate for children her age. (R. 56, Resp't 56.1 Resp. ¶ 44.)

On January 4, 2010, Petitioner filed his Hague application with the Polish Central Authority, and it was received by the U.S. Department of State on January 13, 2010. (R. 47, Pet'r Facts ¶¶ 31-32.) The location of Respondent and the Child were confirmed by the Office of Children's Issues of the U.S. Department of State on April 14, 2010. (R. 47, Pet'r Facts ¶ 33.) Two days later, the Office of Children's Issues received Petitioner's legal assistance form, and Petitioner was provided with a list of potential pro bono attorneys on May 14, 2010. (R. 47, Pet'r Facts ¶¶ 34-35.)

### PROCEDURAL HISTORY

On September 14, 2010, Petitioner initiated this action by filing a Petition for Return of Child under the Hague Convention and ICARA. (R. 1, Pet.) On December 17, 2010, Petitioner moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (R. 43, Pet'r Mot. for Summ. J.) Petitioner claims that he is entitled to summary judgment because he has established each of the elements necessary to establish a case of wrongful removal under the Convention, and Respondent cannot show that any exception under the Convention applies to

4

her case. (R. 44, Pet'r Mem. in Support of Pet'r Mot. for Summ. J. ("Pet'r Mem.") at 6, 11.) In

opposing Petitioner's motion, Respondent argues that summary judgment is not appropriate at

this stage because material issues of fact are in dispute pertaining to Petitioner's *prima facie* case

of wrongful removal and the affirmative defenses she asserts. (R. 57, Resp't Mem. in Opp'n to

Pet'r Mot. for Summ. J. ("Resp't Mem.") at 3.)

## LEGAL STANDARD

Summary judgment is proper when "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law." Fed. R. Civ. P. 56(c). "A disputed fact is 'material' if it might affect the

outcome of the suit under governing law." *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th

Cir. 2009). In resolving a motion for summary judgment, the Court draws all reasonable

inferences and resolves all factual disputes in the non-moving party's favor. *Knight v. Wiseman*,

590 F.3d 458, 462 (7th Cir. 2009).

The moving party has the initial burden of demonstrating that it is entitled to summary

judgment. *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). Once a moving party has met this

burden, the non-moving party must "set out specific facts showing a genuine issue for trial." Fed.

R. Civ. P. 56(e). "The existence of a mere scintilla of evidence, however, is insufficient to fulfill this

requirement. The non-moving party must show that there is evidence upon which a jury reasonably

could find for [it]." *Wheeler*, 539 F.3d at 634.

# ANALYSIS

The Hague Convention, a treaty to which both the United States and Poland are signatories, was adopted to respond to the problem of international child abductions during domestic disputes. *Abbott v. Abbott*, 130 S.Ct. 1983, 1987 (2010) (citing the Hague Convention, art. 1). The drafters of the Convention's provisions sought to address the scenario in which one person, usually a parent, removes a child to, or retains a child in, a country that is not the child's habitual residence in order "to obtain a right of custody from the authorities of the country to which the child has been taken." Elisa Pérez-Vera, *Explanatory Report*, ¶ 13 Hague Conference on Private International Law, Acts and Documents of the Fourteenth Session, Child Abduction 426, (1982) (hereinafter, "Pérez-Vera Report").[3] The Convention thus seeks "to ensure that the rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States" by securing the "prompt return of children wrongfully removed to or retained in any Contracting State." *Abbott*, 130 S.Ct. at 1987. It provides "that a child abducted in violation of 'rights of custody' must be returned to the child's country of habitual residence, unless certain exceptions apply." *Id.*

To discourage forum shopping by parents who believe they are more likely to find a sympathetic court in a different country, "the Convention requires that the determination of whether the child's removal was wrongful must be made under the laws of the country in which the child has his or her 'habitual residence.'" *Altamiranda Vale v. Avila*, 538 F.3d 581, 583 (7th

---

[3] The Pérez-Vera Report is "recognized by the [Hague] Conference as the official history and commentary on the Convention and is a source of background on the meaning of the provisions of the Convention available to all States becoming parties to it." *Koch v. Koch*, 450 F.3d 703, 711 n.4 (7th Cir. 2006). Many circuits treat the Pérez-Vera Report "as an authoritative source for interpreting the Convention's provisions." *Id.* (citations omitted).

6

Cir. 2008) (citation omitted). Additionally, because "[a]n action under the Convention and ICARA is not an action to determine the merits of custody rights," *Koch*, 450 F.3d at 711, the Court's inquiry is limited to the merits of the abduction claim and not the merits of the underlying custody battle. *Ruiz v. Tenorio*, 392 F.3d 1247, 1250 (11th Cir. 2004). "The court's task is to simply determine which country is the proper forum for that custody determination." *Koch*, 450 F.3d at 711.

To prevail in his action for the return of the Child, Petitioner must establish by a preponderance of the evidence that the Child has been wrongfully removed within the meaning of the Convention. 42 U.S.C. § 11603(e)(1)(A). If Petitioner meets this burden, the Child must be returned unless Respondent establishes one of four defenses provided for in the Convention. *See* Hague Convention, articles 12, 13, 20; 42 U.S.C. § 11603(c)(2)(A)-(B). The Court first addresses whether Petitioner has established a case of wrongful removal, and then turns to the defenses asserted by Respondent.

## I.     Wrongful Removal

Under the Convention, there are three main elements that a petitioner must prove to establish the wrongful removal of a child. First, for the Convention to apply, the child must have been a "habitual resident" in the country from which she was removed "immediately before any breach of custody or access rights." Hague Convention, art. 4. Second, the removal must have been "in breach of rights of custody attributed to a person . . . under the laws of the State in which the child was habitually present immediately before the removal . . ." *Id.*, art. 3. Finally, "at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention." *Id.*; *see also Bader v.*

7

*Kramer*, 484 F.3d 666, 668 (4th Cir. 2007) ("A petitioner can establish that the removal of a child is 'wrongful' where: (1) the child was 'habitually resident' in the petitioner's country of residence at the time of removal, (2) the removal was in breach of the petitioner's custody rights under the law of his home state, and (3) the petitioner had been exercising those rights at the time of the removal.").

Petitioner contends that he has established a *prima facie* case of wrongful removal because: (1) "[t]here is no dispute that the Child was habitual resident of Poland prior to her removal"; (2) it is indisputable that "Petitioner has custody rights over the Child by operation of Polish law" and that "the removal of the Child from Poland was in breach of Petitioner's rights of custody"; and (3) "undisputed material facts show that Petitioner was actually exercising his custody rights immediately before the removal of the Child from Poland." (R. 44, Pet'r Mem. at 6, 8-9.)

## A.    Habitual Resident of a Foreign Country

Petitioner first argues that he is entitled to summary judgment on the issue of the habitual residence of the Child. (*Id.* at 6.) Respondent does not dispute that the Child was a habitual resident of Poland prior to her removal, (R. 57, Resp't Mem. at 4), and the Court finds that Petitioner is entitled to summary judgment on the issue of the habitual residence of the Child because she was born in Poland and lived there until her allegedly wrongful removal. (R. 56, Resp't 56.1 Resp. ¶ 3.)

## B.    Breach of Custody Rights

Petitioner next claims that the removal of the Child from Poland was in breach of his rights of custody. (R. 44, Pet'r Mem. at 7.) To establish the second element of wrongful

removal under the Convention, Petitioner must prove both that he has "rights of custody" over the Child under Polish law and that the removal of the Child breached those rights. *See* Hague Convention, art. 3. The Convention states that the "rights of custody . . . may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State." *Id.* "[R]ights of custody . . . include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." *Id.*, art. 5.

In this case, Petitioner argues that he has custody rights over the Child by operation of Polish law because he is the Child's father. (R. 44, Pet'r Mem. at 8.) Specifically, Petitioner relies upon the Polish Family and Guardianship Code, which entrusts both parents with the welfare, custody, care, and upbringing of their children. (R. 1, Pet., Ex. D, Polish Family and Guardianship Code Art. 93 § 1; Art. 95 § 1.) It additionally provides that "important matters" concerning the child must be jointly decided, (*id.*, Art. 97 § 2), and the Supreme Court of Poland has held that the decision concerning the child leaving the country permanently is one such matter. (R. 37, Pet'r Req. for Judicial Notice, Ex. A.) Petitioner thus claims that the removal of the Child violated his rights of custody as provided by Polish law. (R. 44, Pet'r Mem. at 9.) As Respondent has presented no arguments disputing that the removal of the Child was in breach of Petitioner's rights of custody, the Court grants summary judgment to Petitioner on this second element of his *prima facie* case of wrongful removal.

## C.     Exercise of Custody Rights

To satisfy the final element of the *prima facie* case of wrongful removal, Petitioner must prove that he was actually exercising his custody rights at the time the Child was removed from

Poland. Hague Convention, art. 3(b). Petitioner claims that he is entitled to summary judgment on this issue because "[u]ndisputed material facts show that [he] was actually exercising his custody rights immediately before the removal of the Child from Poland, and would have done so but for the Respondent's actions." (R. 44, Pet'r Mem. at 9.) Respondent maintains that issues of material fact remain as to whether Petitioner was exercising his custody rights prior to the removal of the Child from Poland, and that such a fact-specific determination is not proper at the summary judgment stage. (R. 57, Resp't Mem. at 4-5.)

Although the Convention does not define "exercise of custody rights," case law indicates that "a petitioner's burden under Article 3(b) is minimal." *Asvesta v. Petroutsas*, 580 F.3d 1000, 1018 (9th Cir. 2009). Once a petitioner has established that he or she has custody rights under the laws of the country of habitual residence, courts "liberally" find the exercise of those custody rights. *Bader*, 484 F.3d at 670-71 (citing *Friedrich v. Friedrich*, 78 F.3d 1060, 1065 (6th Cir. 1996) (*Friedrich II*); *Sealed Appellant v. Sealed Appellee*, 394 F.3d 338, 344-45 (5th Cir. 2004); *Baxter v. Baxter*, 423 F.3d 363, 370 (3d Cir. 2005)). This expansive interpretation is informed by several factors unique to the mandates of the Convention. First, courts have recognized the inherent difficulty of settling upon a precise definition of "exercise" that is universally applicable. *Id.* Second, the Convention prohibits courts from delving into the merits of the underlying custody dispute, which can easily occur when inquiring into whether a parent was exercising his or her custody rights. *Id.* Finally, courts have taken into account the inherently complicated nature of custody disputes in which it is difficult to assess the acts and motivations of parents regarding their children. *Id.* Under this broad interpretation of "exercise," Courts have developed two standards for determining if a petitioner was actually exercising his or her

10

custody rights at the time of the allegedly wrongful removal. Under either approach, once the Court finds that Petitioner exercised his custody rights in any manner, its inquiry ends as the Court must "completely avoid[] the question of whether [Petitioner] exercised the custody rights well or badly." *Friedrich II*, 78 F.3d at 1066.

Under the first approach, the analysis focuses on the contact between the parent seeking return of the child and the child; if the parent has custody rights under the law, even minimal contact with a child constitutes actual exercise of custody rights. *See, e.g., Sealed Appellant*, 394 F.3d at 344-45 ("[I]n the absence of a ruling from a court in the child's country of residence, when a parent has custody rights under the laws of that country, even occasional contact with the child constitutes "exercise" of those rights."); *Friedrich II*, 78 F.3d at 1064 (A parent exercises custody whenever such "a parent with de jure custody rights keeps or seeks to keep, any sort of regular contact with his or her child."); *Tsai-Yi Yang v. Fu-Chiang Tsui*, 499 F.3d 259, 277 (3d Cir. 2007) ("The petitioner can show the exercise of custody rights by demonstrating that he or she kept or sought to keep, some sort of regular contact with the child.") (citation omitted). This approach accords with the Pérez-Vera Report, which states that Article 3(b) requires that "the applicant provide only some preliminary evidence that he actually took physical care of the child, a fact which normally will be relatively easy to demonstrate." ¶ 73. The intention of the Convention "is to protect *all* the ways in which custody of children can be exercised." *Id.* ¶ 71.

The second inquiry used to determine whether a parent was exercising custody rights, which was first articulated by the Sixth Circuit in *Friedrich II*, focuses not on how a parent exercises those rights, but rather whether he or she has taken affirmative actions to abandon the child. 78 F.3d at 1066. *Friedrich II* held that "if a person has valid custody rights to a child

11

under the law of the country of the child's habitual residence, that person cannot fail to 'exercise' those custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child." *Id.* Several circuit courts have approved of the Sixth Circuit's more stringent standard. *See Baxter*, 432 F.3d at 370 (3rd Circuit); *Bader*, 484 F.3d at 671 (4th Circuit); *Sealed Appellant*, 394 F.3d at 345 (5th Circuit); *Asvesta*, 590 F.3d at 1018 (9th Circuit); *see also Tabachi v. Harrison*, No. 99 C 4130, 2000 WL 190576, at *9 (N.D. Ill. Feb. 10, 2000) ("Short of acts that constitute clear and unequivocal abandonment of the child, a parent should be found to have exercised his or her custody rights under the Convention.") (internal quotation marks and citation omitted). The Sixth Circuit reasoned that requiring a high bar to demonstrate the actual exercise of custody rights was contrary to the Convention's objective of reserving custody determinations for the country of habitual residence of the child. *Friedrich II*, 78 F.3d at 1065.

Because the Seventh Circuit has not addressed this issue, and the two approaches are often used in conjunction with one another, the Court will apply both to the undisputed facts of this case. First, regarding Petitioner's contacts with the Child, there is no dispute that Petitioner visited the Child and provided some monetary support—if infrequently—prior to her removal from Poland. (R. 47, Pet'r Facts ¶¶ 7, 9; R. 56, Resp't 56.1 Resp. ¶¶ 7, 9.) Petitioner sometimes stayed overnight at the home shared by Respondent and the Child, and "occasionally" went shopping and paid for food for Respondent and the Child. (R. 47, Pet'r Facts ¶¶ 6, 9; R. 56, Resp't 56.1 Resp. ¶¶ 6, 9.) Respondent does not dispute that these events occurred; she only disputes their frequency.[4] (R. 56 Resp't 56.1 Resp. ¶¶ 5-9.) Petitioner's contact with the Child is

---

[4] Specifically, Respondent admits that "Petitioner would drop by and visit Respondent and the child," but also claims that he "rarely visited or stayed overnight" and "only occasionally went

also demonstrated by the photos and videos he took of the Child before she was removed from Poland. (R. 47, Pet'r Facts, Ex. 6.) Under the liberal interpretation of the exercise of custody rights established in persuasive case law, Petitioner's minimal involvement in the Child's life, if not ideal, is sufficient to establish the final element of the *prima facie* case of wrongful abduction. By visiting the Child, even if rarely, and providing some monetary support, Petitioner was exercising his custody rights. *See, e.g., Sealed Appellant*, 394 F.3d at 344-45 (holding that district court erred in finding that the petitioner was not exercising his custody rights where the petitioner visited the children about five times a year and paid child support to the mother).

Respondent argues that finding that Petitioner was exercising his custody rights is an improper determination to make at the summary judgment stage. (R. 57, Resp't Mem. at 5.) While summary judgment would be inappropriate if Petitioner's involvement in the Child's life *at all* was in dispute, here, Respondent only disputes the quality and quantity of Petitioner's contact with the Child. Whether Petitioner ever resided with Respondent and the Child is in dispute; that Petitioner visited the Child—if infrequently—is not. (R. 56, Resp't Facts ¶ 2.) Similarly, the frequency with which Petitioner provided monetary support is in dispute; the fact that he occasionally provided groceries for Respondent and the Child is not. (R. 56, Resp't 56.1 Resp. ¶ 9.) It appears that Respondent's primary complaint is that she believed Petitioner was neglectful of his responsibilities as a father. (R. 56, Resp't Facts ¶¶ 2-3.) Whether Petitioner was a good father, however, is not a permissible line of inquiry for the Court to pursue. Instead, Petitioner's undisputed contact with and support of the Child—even if minimal—is dispositive to

---

shopping for food." (*Id.*)

the determination that he was actually exercising his custody rights prior to the Child's removal from Poland.

Regarding the second approach to determining whether Petitioner was exercising his custody rights, there is no evidence in the record of "acts that constitute clear and unequivocal abandonment of the child" on the part of Petitioner. *Friedrich II*, 78 F.3d at 1066. Respondent claims that summary judgment is not appropriate on this issue because she does not concede that "there [is] no evidence in the record demonstrating that [Petitioner] abandoned the Child." (R. 57, Resp't Mem. at 5.) This argument, however, misunderstands that it is *her* burden to provide some evidence of abandonment to overcome summary judgment. *See, e.g., Sealed Appellant*, 394 F.3d at 345 ("To show failure to exercise custody rights, the removing parent must show the other parent has abandoned the child."); Pérez-Vera Report ¶ 73 ("[I]t is for [the alleged 'abductor'] to show, if he wishes to prevent the return of the child, that the guardian has not actually exercised his rights of custody."). Instead, she merely states that "Petitioner failed to perform duties associated with being a father since the child was born," and that "Petitioner abandoned all duties associated with being a father." (R. 57, Resp't Mem. at 5-6.) Such conclusory statements are not evidence, and are thus insufficient to overcome summary judgment. *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 888-99 (1990). Even if Petitioner was absent for weeks at a time, as Respondent claims, "[r]educed contact or lack of financial support over [a period of a few weeks] is insufficient under the Convention to demonstrate that a parent has ceased exercising custody rights." *Baxter*, 423 F.3d at 369-70.

The Court finds that the undisputed facts demonstrate that Petitioner was in contact with and supported the Child; there are also no facts in the record showing the "unequivocal

abandonment" of the Child. Thus, under either standard, Petitioner has met his minimal burden

of establishing that he was actually exercising his custody rights. Accordingly, summary

judgment on the final element of the *prima facie* case of wrongful removal is appropriate. With

this conclusion, the Court finds that Petitioner has established a *prima facie* case of wrongful

removal under the Convention. The Court now turns to the affirmative defenses asserted by

Respondent.

## II.     Affirmative Defenses

Under the Hague Convention, the Court must return a child who is wrongfully removed

unless the respondent can establish one of four possible defenses provided for in the Convention.

42 U.S.C. § 11601(a)(4). The Court must construe all four of the defenses narrowly to effectuate

the purposes of the Convention, and even where a defense applies, the Court has discretion to

order the child's return. *Id.* Petitioner claims that the undisputed record in this case precludes

Respondent from successfully proving any of the available defenses. (R. 44, Pet'r Mem. at 11.)

### A.     Respondent's Defense of "Consent or Acquiescence"

The first affirmative defense asserted by Respondent is that Petitioner consented to the

removal of the Child from Poland and/or acquiesced to the Child's retention in the United States.

(R. 57, Resp't Mem. at 6.) Under the Convention, the Court is not bound to order the return of

the Child if Respondent establishes by the preponderance of the evidence that Petitioner "had

consented to or subsequently acquiesced in the removal or retention." 42 U.S.C. §

11603(e)(2)(b); Hague Convention, art. 13(a). Petitioner claims that the undisputed facts in the

record show that this defense is not available to Respondent. (R. 44, Pet'r Mem. at 13-14.)

## 1. Consent

First, regarding the issue of consent, the only evidence put forth by Respondent in support of this defense is that Petitioner consented to the Child obtaining a passport in order to visit family in Chicago. (R. 57, Pet'r Mem. at 6.) Even assuming this is true, the fact that Petitioner and Respondent conversed about hypothetical visits to Respondent's family does not establish that Petitioner consented to the Child's removal in this case. *See Baxter*, 423 F.3d at 371 ("The fact that a petitioner initially allows a children to travel, and knows their location and how to contact them, does not necessarily constitute consent to removal or retention under the Convention.") (citations omitted). Instead, the undisputed facts show that Respondent did not inform Petitioner of her plans, and that she believed Petitioner would have objected to them leaving Poland had he known about the plans. (R. 47, Pet'r Facts ¶¶ 11-12; R. 56, Resp't 56.1 Resp. ¶¶ 11-12.) Petitioner could not have consented to a plan of action of which he had no knowledge. Thus, the Court finds that Petitioner is entitled to summary judgment on the affirmative defense of consent.

## 2. Acquiescence

Respondent also claims that Petitioner's minimal attempts to contact the Child since she was removed from Poland constitute acquiescence. (R. 57, Resp't Mem. at 6-7.) Although the Convention does not define "acquiescence," courts that have addressed the issue have required "an act or statement with the requisite formality, such as testimony in a judicial proceeding; a convincing written renunciation of rights; or a consistent attitude of acquiescence over a significant period of time." *Friedrich II*, 78 F.3d at 1070 (internal footnotes omitted); *see also Nicolson v. Pappalardo*, 605 F.3d 100, 108-09 (1st Cir. 2010); *Baxter*, 423 F.3d at 371. The

"acquiescence inquiry turns on the subjective intent of the parent who is claimed to have acquiesced." *Baxter*, 423 F.3d at 371 (citations omitted).

In this case, although there has clearly not been a formal act or statement of acquiescence, there is a genuine dispute regarding whether Petitioner maintained "a consistent attitude of acquiescence." Viewed in the light most favorable to Respondent, her claims that Petitioner has failed to remain in contact the Child could demonstrate a lack of interest on the part of Petitioner in the Child. Weighing against this conclusion are Petitioner's attempts to pursue legal channels to have the Child returned. However, there are several significant time gaps in which Petitioner took no action regarding the legal proceedings, and, drawing all inferences in favor of Respondent at this stage, the disputed facts create a triable issue as to whether Petitioner acquiesced to the Child remaining in the United States. This issue can be addressed at the upcoming evidentiary hearing.

### B. Respondent's "Grave Risk" Defense

Respondent's second affirmative defense is that returning the Child to Poland would subject her to grave harm at the hands of Petitioner. (R. 57, Resp't Mem. at 7.) Under the Convention, the Court need not order the return of the Child if "there is a grave risk that [her] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention, art. 13(b). Respondent has the burden of proving there is a grave risk to the Child by clear and convincing evidence. 42 U.S.C. § 11603(e)(2)(A). "[T]he clear and convincing standard of proof lies between beyond a reasonable doubt and a preponderance of the evidence." *Matter of Rose*, 934 F.2d 901, 904 (7th Cir. 1991) (citing

17

*Addington v. Texas*, 441 U.S. 418, 425 (1979)). The Second Circuit has characterized the "grave risk" exception as follows:

> At one end of the spectrum are those situations where repatriation might cause inconvenience or hardship, eliminate certain educational or economic opportunities, or not comport with the child's preferences; at the other end of the spectrum are those situations in which the child faces a real risk of being hurt, physically or psychologically, as a result of repatriation. The former do not constitute a grave risk of harm under Article 13(b); the latter do.

*Blondin v. Dubois*, 238 F.3d 153, 162 (2d Cir. 2001). To defeat summary judgment on this affirmative defense, Petitioner must put forth "specific evidence of potential harm to the child upon [her] return." *Baxter*, 423 F.3d at 374. Regarding the grave risk exception as applied to allegations of abuse, the Seventh Circuit has held that a grave risk of harm to the child means "that the [petitioning] parent may with some nonnegligible probability injure the child." *Van de Sande*, 431 F.3d at 571.

In this case, Respondent claims that Petitioner was physically and emotionally abusive towards her and the Child. (R. 57, Resp't Mem. at 8.) She testified at her deposition that Petitioner would scream violently at the Child, and had struck the Child hard enough to cause bruising on several occasions. (R. 56, Resp't Facts, Ex. C at 66-71.) She also stated that Petitioner attempted to run the Child over with his car, which has caused the Child to have a lasting fear of cars and engine noises. (*Id.*) Petitioner also testified that she was too afraid to report the abuse because Respondent had threatened to kill her. (*Id.*) Petitioner also allegedly abused drugs and alcohol in front of the Child. (*Id.* at 28-31.) Respondent denies all of these allegations. (*Id.*, Ex. A at 62-65, 69.) Construing all disputed facts and inferences in Respondent's favor, Respondent's allegations of Petitioner's repeated, serious abuse of the Child demonstrates a "nonnegligible probability" that Petitioner would injure the Child if she were

18

returned to Poland. The Court thus denies summary judgment on this affirmative defense, which is the second issue that can be addressed at the upcoming evidentiary hearing.

## C.    Respondent's "Public Policy" Defense

Respondent also asserts the public policy defense provided for in Article 20 of the Convention. (R. 57, Resp't Mem. at 9.) Article 20 states that "[t]he return of the child . . . may be refused if this would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms." Respondent has the burden of proving an Article 20 exception by clear and convincing evidence. 42 U.S.C. § 11603(e)(2)(A). This defense is meant to be "restrictively interpreted and applied . . . on the rare occasion that return of a child would utterly shock the conscience of the court or offend all notions of due process." *Hazbun Escaf v. Rodriguez*, 200 F. Supp. 2d 603, 614 (E.D. Va. 2002) (quoting Department of State, *Hague International Child Abduction Convention: Text and Legal Analysis*, Pub. Notice 957, 51 Fed. Reg. 10494, 10510 (1986) (hereinafter "Dept. of State, *Text and Legal Analysis*")); *see also Aldinger v. Segler*, 263 F. Supp. 2d 284, 290 (D.P.R. 2003) ("Article 20 . . . is directed to concerns about harms arising from the child's return to a particular country. Article 20 envisioned a limited situation where human rights concerns, most likely defined within the parameters of other international agreements, would prohibit return.") (citing Linda Silberman, *Hague Convention on International Child Abduction: A Brief Overview and Case Law Analysis*, 28 Fam. L.Q. 9, 28-9 (1994)).

In this case, Respondent argues that Article 20 applies because domestic abuse is a serious problem in Poland, and thus returning the Child to Poland would offend the principles espoused in Illinois laws enacted to protect women and children from abuse. (R. 57, Resp't

Mem. at 10.)  Respondent's argument fails for three reasons.  First, while the Court takes the problem of domestic abuse very seriously, Respondent has failed to show that its purported prevalence in Poland meets the "shocks the conscience" standard required to fall under the Article 20 exception.  Second, that the Child faces the threat of being a victim of domestic violence if she is returned to Poland is more properly addressed by the "grave risk" exception, which the Court has previously discussed.[5]  *See* Dept. of State, *Text and Legal Analysis*, 51 Fed. Reg. 10494, 10510 (Proponents of the public policy exception "believed that under some extreme circumstances not covered by the exceptions of Article 13 a court should be excused from returning a child to the country of habitual residence.").  Finally, the Convention requires that the fundamental principles of the State *not permit* the return of the child; merely offending principles espoused in Illinois laws is insufficient.  *See* Hague Convention, art. 20.  Respondent has failed to point to any "fundamental principle" that would not permit the return of the Child, nor presented any evidence which shows that return of the Child "would utterly shock the conscience or offend all notions of due process."  The Court accordingly grants summary judgment for Petitioner regarding Respondent's Article 20 public policy defense.

### D.  Respondent's "Settled" in New Surroundings Defense

The final affirmative defense asserted by Respondent is that Petitioner initiated judicial proceedings more than a year after the Child was removed from Poland, and the Child is now settled in Illinois.  (R. 57, Resp't Mem. at 10.)  The Convention provides that a child wrongfully removed must be returned if less than one year has elapsed between the date of the

---

[5]  In addressing the Article 20 exception, the only case cited by Respondent is one in which the court was applying the "grave risk" exception. *Miltiadous v. Tetervak*, 686 F. Supp. 2d 544, 554 (E.D. Pa. 2010).

commencement of the judicial proceedings and the wrongful removal of the child. Hague

Convention, art. 12. However, if the period is longer than one year, the Court need not order the

child's return if "it is demonstrated that the child is now settled in its new environment." *Id.*

Petitioner admits that he filed the petition more than one year after the Child was

removed from Poland, but argues that the Court should toll the Convention's filing period

because Respondent concealed the location of the Child. (R. 44, Pet'r Mem. at 16.) Petitioner

alternatively argues that the material facts in this case show that the Child is not settled under the

requirements of the Convention. (*Id.* at 19.)

### 1. Tolling

Although the Convention does not provide for tolling of the one-year filing period, courts

have held that equitable tolling should apply where the abducting parent took steps to conceal the

whereabouts of the child. *See Duarte v. Bardales*, 526 F.3d 563, 570 (9th Cir. 2008); *Furnes v.*

*Reeves*, 362 F.3d 702, 723 (11th Cir. 2004). In *Duarte*, the Ninth Circuit reasoned that "[l]ogic

and equity dictate that awarding an abducting parent an affirmative defense if that parent hides

the child from the person seeking return would not only encourage child abductions, but also

encourage hiding the child from the parent seeking return." 526 F.3d at 570. However, the mere

concealment of the child is not enough; for equitable tolling to apply, two conditions must be

met: "(1) the abducting parent concealed the child and (2) that concealment caused the

petitioning parent's delay." *In re B. Del C.S.B.* 559 F.3d 999, 1014 (9th Cir. 2009) (citing

*Duarte*, 526 F.3d at 570).

While the Seventh Circuit has not addressed whether equitable tolling applies to the one-

year filing period of the Convention, the Court finds the reasoning of the Ninth and Eleventh

Circuits compelling. However, material facts are in dispute as to whether Respondent concealed

the Child, and if she did, if that concealment caused Petitioner's delay. Petitioner claims that due

to Respondent's concealment of the child, he did not affirmatively learn of the Child's location

until the U.S. Marshals located the Child on October 6, 2010. (R. 47, Pet'r Facts ¶ 38.)

Respondent claims that Petitioner knew about the Child's location soon after her removal

because Petitioner was aware that Respondent's sister lived in Chicago, he had sent a letter to the

Polish Consulate in Chicago seeking help within two months of the removal, and was informed

by an acquaintance that Respondent and the Child were seen in Chicago more than a year before

he filed the petition. (R. 57, Resp't Mem. at 12-13.) These disputed material facts require the

Court to deny Petitioner's motion for summary judgment request as it pertains to the tolling issue

of the "settled" affirmative defense asserted by Respondent. This is the third issue that can be

addressed at the evidentiary hearing.

### 2. Settled in New Environment

Assuming that the Court does not toll the one-year filing period, Respondent argues that

the Child should not be returned to Poland because she is settled in her new environment.

Petitioner, however, contends that the undisputed facts establish that the Child is not settled in

Illinois. (R. 44, Pet'r Mem. at 19-20.) To succeed in asserting this defense, Respondent must

prove that the Child is settled by the preponderance of the evidence. 42 U.S.C. § 11603(e)(2)(B).

Though the Convention does not provide a definition for the term "settled," "the U.S. State

Department has declared that 'nothing less than substantial evidence of the child's significant

connections to the new country is intended to suffice to meet the respondent's burden of proof.'"

*In re B. Del C.S.B.*, 559 F.3d at 1003 (quoting Dept. of State, *Text and Legal Analysis*, 51 Fed.

22

Reg. 10494, 10509). The factors courts consider in determining if a child has "significant connections" to the new country include: "(1) the child's age; (2) the stability and duration of the child's residence in the new environment; (3) whether the child attends school or day care consistently; (4) whether the child has friends and relatives in the new area; (5) the child's participation in community or extracurricular school activities, such as team sports, youth groups, or school clubs; and (6) the respondent's employment and financial stability." *Id.* at 1009. While courts also consider the immigration status of the respondent and the child, "only a case in which there is an immediate concrete threat of removal can immigration status constitute a significant factor with respect to the question whether a child is 'settled.'" *Id.* at 1010.

Respondent maintains that the Child is settled in Illinois because she has been living in Chicago for nearly two years, regularly spends time with family and friends, plays with neighborhood children, and has developed strong ties to her family that resides in Chicago. (R. 56, Resp't Facts ¶¶ 10-12.) Respondent also contends that she has steady employment, and lives in her own apartment with the Child's grandmother. (*Id.* ¶¶ 7, 9.) She has taken the Child to the doctor and dentist regularly, attends church every week with the Child, and has applied for the Child to attend preschool. (*Id.* ¶ 8.) Petitioner claims the Child is not settled because of the allegedly undocumented immigration status of Respondent and the Child, Respondent's low income, and the Child's lack of connections with the community. (R. 47, Pet'r Facts ¶¶ 39-45.) Given both the fact-specific nature of this inquiry and the significant dispute as to whether the Child has "significant connections" to Illinois, the Court denies Petitioner's motion for summary judgment as to Respondent's affirmative defense that the Child is now "settled" in Illinois. This is the fourth and final issue that can be addressed during the Court's evidentiary hearing.

23

## CONCLUSION

For the foregoing reasons, Petitioner's motion for summary judgment (R. 43) is granted in part and denied in part. Summary judgment is DENIED as to Respondent's "acquiescence," "grave risk," and "settled" affirmative defenses. Summary judgment is GRANTED in favor of Petitioner and against Respondent as to the three elements of the *prima facie* case of wrongful removal under the Hague Convention. Summary judgment is also GRANTED as to Respondent's "consent" and "public policy" affirmative defenses.

The Court will proceed to preside over an evidentiary hearing that will address the four issues that remain in the action. The Court commends appointed and pro bono counsel for their expedited work and requests their input with respect to the best manner to proceed. The Court suggests that all direct testimony be submitted by appropriate evidentiary affidavits and that all adult witnesses be available for live cross-examination. The Court wishes to avoid having the Child testify if at all possible. These matters will be discussed at the next status hearing on January 11, 2011 at 10:00 am in open court.

Entered:

**Judge Ruben Castillo**
**United States District Court**

**Dated:** January 7, 2011