# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| DAWID GRZEGORZ HABRZYK, ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| v. ) | No. 10 C 5830 |
| ) | |
| BOGUSLAWA MONIKA HABRZYK, ) | Judge Ruben Castillo |
| ) | |
| Respondent. ) | |

## MEMORANDUM OPINION AND ORDER

Dawid Grzegorz Habrzyk ("Petitioner") brings this action for the return of his daughter

(the "Child") to Poland under the Hague Convention on the Civil Aspects of International Child

Abduction, Oct. 25, 1980, T.I.A.S. No. 11670, S. Treaty Doc. No. 99-11 ("Hague Convention" or

"Convention"), and implemented by the International Child Abduction Remedies Act, 42 U.S.C.

§ 11601 *et seq.* ("ICARA"). (R. 1, Pet.) The Court previously concluded that Boguslawa

Monika Habrzyk ("Respondent"), the Child's mother, wrongfully removed the Child from

Poland on April 3, 2009. *Habrzyk v. Habrzyk*, No. 10 C 5830, 2011 WL 63903 (N.D. Ill. Jan. 7,

2011). Respondent has asserted several affirmative defenses under the Convention, which are

the remaining issues before the Court. (R. 21, Resp't Answer and Affirmative Defenses.) The

Court held an evidentiary hearing in this matter on February 24 and 25, 2011. (R. 98.) For the

reasons stated below, the Court finds that Respondent has failed to establish any affirmative

defenses under the Convention, and grants Petitioner's Petition for the Return of the Child.

# BACKGROUND

On September 14, 2010, Petitioner initiated this action by filing a Petition for Return of

the Child under the Hague Convention and ICARA. (R. 1, Pet.) On December 17, 2010,

Petitioner moved for summary judgment, which the Court granted in part and denied in part. (R.

43, Pet'r Mot. for Summ. J.) The Court found that Petitioner had established that Respondent

had wrongfully removed the Child from Poland, but that there were issues of material fact with

respect to several of Respondent's affirmative defenses under the Convention. *Habrzyk*, 2011

WL 63903, at *14. On February 24 and 25, 2011, the Court held an evidentiary hearing

regarding Respondent's remaining affirmative defenses. (R. 98.) The parties also filed post-

hearing briefs. (R. 102, Pet'r Mem.; R. 106, Resp't Mem.; R. 110 Pet'r Resp.; R. 109, Resp't

Resp.) At this stage, Respondent asserts two affirmative defenses.[1] First, Respondent contends

that Petitioner initiated judicial proceedings more than a year after the Child was removed from

Poland, and the Child is now settled in Illinois (the "settled" defense). (R. 106, Resp't Mem. at

3.) Second, Respondent argues that returning the Child to Poland would subject her to a grave

risk of harm at the hands of Petitioner (the "grave risk" defense). (*Id.* at 12.)

## FINDINGS OF FACT[2]

Petitioner and Respondent met in a dance club in Poland sometime in 2003. (Tr. at 36.)

---

[1] Respondent initially asserted all of the available affirmative defenses under the Convention. (R. 21, Resp't Answer and Affirmative Defenses.) The Court subsequently granted summary judgment in favor of Petitioner and against Respondent with respect to Respondent's "consent" and "public policy" defenses. *Habrzyk*, 2011 WL 63903, at *14. Respondent withdrew her "acquiescence" defense on March 17, 2011. (R. 99, Notice of Withdrawal of Acquiescence Affirmative Defense.) Thus, only the "settled" and "grave risk" defenses remain.

[2] Because the only issues presently before the Court are Respondent's "settled" and "grave risk" affirmative defenses, the Court focuses its findings of fact on those two defenses. Additional facts are discussed in the Court's prior opinion. *Habrzyk*, 2011 WL 63903, at *1-2.

A few years later, Respondent became pregnant, leading to Respondent and Petitioner's marriage a few months later. (*Id.*) On July 28, 2006, the Child was born in Wadowice, Poland. (*Id.* at 33.) The Child initially lived with Respondent at Respondent's parents' house in Glebowice, Poland. (*Id.* at 36.) Petitioner visited regularly and frequently stayed overnight. (*Id.* at 38.) When he did not stay with Respondent at her parents' house, he lived with his mother. (*Id.* at 36.) This living situation was the source of some marital strife, as Respondent did not understand why Petitioner refused to live with them, and frequently encouraged Petitioner to live with her and the Child at her parents' home. (*Id.* at 37.)

Respondent testified that Petitioner was not happy about the pregnancy when he received the news, and that his lack of enthusiasm for his newfound role of father continued after the Child was born. (*Id.* at 36, 37-38.) Petitioner provided some financial support to Respondent and the Child, such as buying groceries and helping with bills, but Respondent believed the support was inadequate and filed for child support in 2006. (*Id.* at 57.) She also planned to file for divorce, but her lawyer counseled her to apply for child support first to expedite the process of receiving payments. (*Id.* at 57-58.) The disposition of these proceedings is not clear, but Respondent and Petitioner apparently resolved their differences—if temporarily—and continue to be married.

At some point around the end of 2007, Respondent, Petitioner, and the Child moved to a new home in the town of Nowa Wies, Poland. (*Id.* at 57.) While the circumstances surrounding the purchase and financing for the house are disputed, both Respondent and Petitioner viewed moving into the new house as an opportunity to be a "normal family." (*Id.* at 52.) Respondent contends that Petitioner never actually moved into the house with her and the Child, but the

evidence—including Respondent's own testimony—shows that he resided there most, if not all, of the time. (*Id.* at 41.) The house was still under construction when they moved in, and Petitioner, Respondent's father, and workers hired by Petitioner were rehabbing various parts of the home while Petitioner, Respondent, and the Child lived there. (*Id.* at 70-72, 143-44.) They lived in this home until Respondent left for the United States with the Child, without informing Petitioner of her plans, on April 3, 2009.

## I.    Allegations of Abuse

Respondent claims that Petitioner physically and emotionally abused her and the Child before they left Poland. She stated that Petitioner frequently came home drunk, acted aggressively, and physically abused her and the Child. (*Id.* at 41.) She testified that he threw "every single object" in their house when he was angry. (*Id.*) Respondent stated that on one occasion, Petitioner grabbed a small axe that was among the tools being used to refurbish the new house and threatened to kill her and the Child. (*Id.*) She also testified that his attacks left frequent bruises, and that she had abrasions from being struck by objects thrown at her by Petitioner. (*Id.* at 44.) Regarding the Child, Respondent stated that she was not abused by Petitioner in the "same sense" as he abused Respondent, but that Petitioner had punched, kicked, and been otherwise physically violent towards the Child. (*Id.*)

Respondent never went to the police to report the abuse. She said that she was afraid that the police would take her statement and send her home, where she would be unprotected from her husband's abuse. (*Id.* at 46-47.) Respondent testified that Petitioner said that he would kill her if she went to the police or told anyone about the abuse. (*Id.* at 47.) Respondent also did not report the abuse to any doctors, including the Child's pediatrician. (*Id.* at 60.) Respondent did

4

testify that that she told some of her neighbors in Poland about the abuse she suffered, including Rafal Grabara, Renata Grabara, and Malgorzata Kramarczyk ("Kramarczyk"). (*Id.* at 56-57.) She said that her neighbors were located close to her home, and could see objects flung from the windows by Petitioner when he was angry. (*Id.*) These neighbors, however, denied witnessing any abuse or violence by Petitioner. They stated that they never saw any bruises or other indications of Petitioner's abuse of Respondent or the Child, and did not suspect there was any abuse going on in the Habrzyk home. (*Id.* at 119-21; Pet'r Hr'g Ex. 59, Renata Grabara Dep. Tr. at 17-21; Rafal Grabara Dep. Tr. at 17.) The Child's pediatrician also did not observe any signs of abuse. (Tr. at 67.)

The only neighbor who testified at the hearing, via video, was Kramarczyk. Her home is located about twenty meters from the home shared by Petitioner and Respondent in Nowa Wies, and they shared a common yard. (*Id.* at 116.) It is undisputed that Kramarczyk saw Respondent and the Child nearly every day for two or three hours during the time they lived in Nowa Wies. (*Id.*) She said that she had witnessed one fight between Petitioner and Respondent, but that the fight was only verbal in nature. (*Id.* at 119.) She testified that she never had any reason to believe Petitioner was abusive towards Respondent or the Child. (*Id.* at 119-21.) She never observed any indication of any injuries or other signs of abuse despite seeing both Respondent and the Child every day. (*Id.*) Kramarczyk also testified that she had been contacted by Respondent in November of 2010, and Respondent asked her to write a letter saying that Petitioner abused Respondent and used illegal drugs. (*Id.* at 123-24.) Kramarczyk said that Respondent told her that she wanted to divorce Petitioner and that she did not want to return to Poland. (*Id.* at 124-25.) Kramarczyk refused Respondent's request, saying that she would not

lie.  (*Id.* at 124.)

The other witnesses at the hearing were Respondent's sister, Izabella Kolasa, her mother, Krystyna Kolasa, and her brother-in-law, Jacek Radecki ("Radecki").  Her mother and sister testified that Respondent was unhappy and suffering in her marriage, but neither specifically stated that Petitioner abused Respondent or the Child.  (*Id.* at 84, 96-97, 101-02.)  Radecki said that Petitioner threatened to kill Respondent in a phone call with Radecki after Respondent had left Poland with the Child, but that he did not take the conversation or threat seriously and told no one.  (*Id.* at 20-22.)

At the hearing, Petitioner denied Respondent's allegations of abuse.  He said he has never struck his wife, and that he would rather cut his hand off than beat his daughter.[3]  (*Id.* at 197.)

After reviewing the evidence at the hearing and the deposition testimony of friends, neighbors, and family members in Poland, the Court finds that Respondent's allegations of abuse are uncorroborated, and not supported by clear and convincing evidence.[4]  This is unfortunately a "he said, she said" issue, and the Court finds that Respondent failed to meet her burden of proof. This determination is based on the respective testimony and demeanors of Respondent and Petitioner at the hearing, as well as the hearing and deposition testimony of other witnesses that directly contradict Respondent's claims of frequent and violent abuse.

First, Respondent's own testimony had a pattern of inconsistencies that leads the Court to believe that she was less than candid.  Respondent claimed that Petitioner never lived with her

---

[3]  Attempting to damage Petitioner's credibility, Respondent raised a conviction Petitioner received for forgery in 2010.  (*Id.* at 11.)  The circumstances regarding the conviction as described in Petitioner's testimony, however, do not lead the Court to conclude that Petitioner has any tendency to lie.  (*Id.* at 132-35.)

[4]  As discussed below, these allegations pertain to Respondent's "grave risk" defense, which must be proven by clear and convincing evidence under ICARA.  42 U.S.C. § 11603(e)(2)(A).

and the Child at the Nowa Wies home, (*id.* at 52), but then talked about Petitioner frequently "coming home" intoxicated or under the influence of drugs. (*Id.* at 41–42.) She said that she lived "in terror" of Petitioner (*id.* at 59), but at the same time, most of their marital problems were caused by Petitioner's failure to spend enough time with Respondent and the Child. (*Id.* at 40.) She also wanted Petitioner to move to the United States with her and the Child. (*Id.* at 144.) Respondent said that she was too scared to go to the police to report the alleged abuse, but she had previously gone to a lawyer to file for a divorce and child support. (*Id.* at 56-58.) Petitioner's explanation for this discrepancy was that she was living with her parents at the time she filed for child support, and her father's presence made her feel safe. (*Id.* at 59-61.) There is nothing to indicate, however, that her family would not have provided her with similar support had she reported the abuse. While her mother did move to the United States in 2008, Respondent's father, who was a "help" to Respondent and would have protected her from Petitioner when she filed for child support in 2006, was still in Poland at the time Respondent left in 2009. (*Id.* at 60-61.)

Second, the hearing and deposition testimony of other witnesses contradicts Respondent's allegations of abuse. Not a single witness testified that they saw or suspected that Petitioner had abused Respondent and the Child. In a typical case with domestic abuse allegations, this lack of corroboration of Respondent's claims would not be surprising. The Court is very aware that "[b]ecause of the privacy of the family and parental control of children, most abuse of children by a parent goes undetected." *Van de Sande v. Van de Sande*, 431 F.3d 567, 571 (7th Cir. 2005). In this case, however, Respondent testified that the neighbors could hear Petitioner's acts of violence. She also said that she had frequent bruises and abrasions from the abuse, and that she

7

told her neighbors about the abuse. All of these neighbors, though, testified that they did not know or suspect that Petitioner abused Respondent or the Child. The deposition testimony of Respondent's father, Boguslaw Kolasa, and the Child's godparents, Marcin Kolasa and Iwona Kolasa, also does not support Respondent's allegations. (Pet'r Hr'g Ex. 59, Boguslaw Kolasa Dep. Tr. at 21, 25; Marcin Kolasa Dep. Tr. at 15-18; Iwona Kolasa Dep. Tr. at 13.)

The only support for Respondent's claims of Petitioner's violent tendencies comes from Radecki, her brother-in-law, who said that Petitioner had threatened to kill Respondent and the Child during a phone call after they had arrived in the United States. However, the Court gives this testimony little weight. Radecki's testimony was inconsistent and foundationally weak. Additionally, even if Radecki were to be believed, the Court believes that "such a threat could be discounted as an emotional reaction to the prospect of losing custody of [the Child]." *Van de Sande*, 431 F.3d at 570. Radecki himself testified that he did not take the alleged threat seriously. (Tr. at 21, 23-24.)

In finding that Respondent's claims of frequent and violent abuse are not credible, the Court notes that the evidence does not establish that Petitioner never abused Respondent or the Child. Instead, the evidence shows that Respondent's testimony was more likely than not exaggerated. Because Respondent's allegations pertain to domestic abuse, merely inconsistent testimony or lack of corroboration would not cause the Court to doubt Respondent's credibility. The story of abuse Respondent told on the witness stand, however, was directly contradicted by

the testimony of seemingly neutral third parties.[5]

Respondent contends that these witnesses lied because they fear Petitioner. (R. 109, Resp't Resp. at 12-13.) The Court rejects this argument for two reasons. First, there is no evidence of intimidation of witnesses in the record other than Respondent's—and Respondent's counsel's—statements at a deposition. (*Id.*, Ex. 14 at 29-31.) Petitioner's presence at the deposition of the witnesses does not lead to the conclusion that the witnesses lied out of fear, as Respondent suggests. (*Id.* at 12.) Kramarczyk, the only witness from outside Petitioner's and Respondent's families whose credibility the Court could assess, believed Petitioner was a man with a good reputation who did not abuse his wife or child, (Tr. at 116, 118.), and there was no indication that she was testifying out of fear. Second, this unsupported accusation does not explain why not a single witness—including Respondent's own family members—could support her claim of frequent abuse that was so violent that it left visible bruises and abrasions. Respondent's mother, with whom Respondent lived during part of the period in which she claims she was being abused, testified only that she had seen her daughter crying after verbal fights with Petitioner. (*Id.* at 100-02.) Even though Respondent's mother now lives in the United States—far from Petitioner—she provided no specific corroborating testimony in support of Respondent's claims of frequent and violent abuse. While it is entirely possible that the witnesses in Poland lied out of fear of Petitioner, the Court cannot reach that conclusion when

---

[5] In attempting to argue that the testimony of these "disinterested witnesses" does not contradict Respondent's testimony, Respondent claims that "[a]t the most, Petitioner's 'disinterested witnesses' only establish that they never saw any abuse, not that it never happened." (R. 109, Resp't Resp. at 13-14.) The Court agrees that the testimony of the "disinterested witnesses" does not affirmatively establish that no abuse ever occurred. However, these witnesses said they never saw any indication of abuse or suspected any abuse, which does directly contradict the testimony of Petitioner, who testified that there were visible indications of the abuse, and that she told her neighbors about the abuse.

there is no evidence to support it.[6]

Respondent also claims that her "fleeing" from Poland shows that she was trying to escape her abusive husband. (R. 109, Resp't Resp. at 9.) The undisputed, objective evidence, however, establishes that she had other reasons to move to Chicago. First, Respondent's sister and mother had relocated to Chicago. (Tr. at 98-99.) They encouraged Respondent to move to Chicago, where they said Respondent, Petitioner, and the Child could have a better life. (*Id.* at 144.) Kramarczyk, Respondent's neighbor, testified that Respondent often talked of her desire to move to the United States with Petitioner and the Child. (*Id.* at 121-22.) Petitioner, however, had made it very clear that he had no intention of leaving his family and business in Poland to live as an undocumented immigrant in the United States. (*Id.* at 144-45.) Respondent knew that if she shared her plans with Petitioner, he would not have agreed to go and would not have consented to her taking the Child to the United States, necessitating the secrecy Respondent employed in leaving Poland.

Second, in addition to the promises of a better life in the United States, Respondent was facing financial problems related to the home in Nowa Wies. It is unclear exactly how the loan to purchase the house was obtained. Respondent claims that Petitioner forced her to apply for a loan using fraudulent documents. (*Id.* at 52.) She said he convinced her that it was their opportunity to have their own home and to live like a "normal family." (*Id.*) Petitioner claims that he believed Respondent purchased the house with insurance money from her brother's death.

---

[6] Respondent's arguments pertaining to Petitioner's failure to call certain witnesses, including his mother, to testify are also unavailing. Respondent had the ability to call any of the witnesses she thought would support her allegations, including Petitioner's mother. Moreover, as discussed below, Respondent, not Petitioner, carries the burden of proving the affirmative defenses under the Convention.

(*Id.* at 140.) He testified that he did not know that there was a mortgage on the home until his father-in-law gave him loan notices sent to his father-in-law's address after Respondent left Poland. (*Id.* at 142-43.) Petitioner believed that Respondent paid for the house, and that he would pay for the remaining construction and any other continuing expenses. (*Id.* at 141.) No matter which side of the story is believed, however, it is undisputed that the loan was in Respondent's name. The loan was delinquent several thousand dollars (13,000 zlotys) around the time Respondent left Poland, and over $90,000 (260,000 zlotys) was owed on the loan. (Pet'r Hr'g Ex. 6.) Clearly, Respondent was facing impending financial trouble, whether it was through her own fault or Petitioner's.

Finally, the evidence shows that Respondent was unhappy in her marriage. She testified repeatedly about Petitioner's failure to live up to her expectations of him as a husband and father. When asked how Petitioner treated her when they were married, Respondent stated, "Well, this was very variable. There were times when I thought that everything would be okay and I was in high spirits. I thought we would become a real family and he would be a good father and everything, and then the other times came and then I lost hope." (Tr. at 40.) Respondent was particularly unhappy with Petitioner's lack of financial support. She, like most parents, wanted nice things for the Child, and felt that Petitioner failed to properly provide for them. This disappointment with Petitioner was shared by Respondent's mother and sister, (*id.* at 83), who encouraged her to leave him and come to Chicago, which is exactly what Respondent did in April of 2009.

Respondent also maintains that Petitioner frequently abused alcohol and illegal drugs, including while he was in the presence of the Child. (*Id.* at 41-43.) Petitioner admits to having

11

abused alcohol in the past, which resulted in a conviction for driving under the influence in 2001. (*Id.* at 9.) At the hearing, however, he denied abusing alcohol and drugs in the recent past. Once again, the main evidence before the Court in support of this allegation is Respondent's own testimony. Respondent's family and neighbors testified that they had seen Petitioner consume alcohol, but only in social settings. (*Id.* at 72, 119; Pet'r Hr'g Ex. 59, Renata Grabara Dep. Tr. at 16, 21; Rafal Grabara Dep. Tr. at 12.) The only support for Respondent's claims regarding Petitioner's drug abuse comes from Radecki, who says Petitioner called him to ask him for money for a drug rehabilitation program at some point in 2009. (*Id.* at 18-20.) However, Radecki said he received this phone call out of the blue, having never spoken to Petitioner before that phone call. (*Id.* at 22.) He never discussed this phone call with anyone, including his wife, Respondent's sister-in-law. (*Id.* at 23.) The Court strongly doubts this alleged conversation occurred in the manner depicted by Radecki. Accordingly, the Court finds that Respondent's allegations of Petitioner's frequent alcohol and drug abuse are not supported by clear and convincing evidence.

## II.    The Child's Life in Illinois

On April 3, 2009, Respondent left Poland with the Child on a flight to Toronto, Canada. (*Id.* at 33.) Respondent's sister, Izabella Kolasa, had purchased the tickets for Respondent and the Child on March 25, 2009. (*Id.* at 54.) After spending a few weeks in a hotel in Canada, Respondent and the Child entered the United States via boat without passing through immigration. (*Id.* at 34.) They next traveled to Chicago where they lived with Respondent's sister and brother-in-law for several months. (*Id.* at 33-34.)

In June 2010, Respondent and the Child moved into an apartment in a suburb of Chicago.

They share this apartment with Respondent's mother, who takes care of the Child while Respondent is working. (*Id.* at 35.) Respondent cleans houses and earns between $200 and $400 per week. (*Id.* at 34-35.)

At the time of the filing of the petition, the Child did not attend school or daycare. Outside of the home, the Child attends church on a weekly basis and plays with her cousins, the children of Respondent's sister and brother-in-law, as well as some children in her neighborhood. (*Id.* at 48-49.) Regarding the Child's minimal involvement in activities outside of the home, Respondent stated, "I didn't want to force her. I thought, you know, after all that she went through, that she should spend more time at home and just being a child who is loved and rather than be forced among strangers, so that's—that's the choice I made." (*Id.* at 61.)

As part of the proceedings before this Court, a licensed clinical social worker, Jo Anne Smith, conducted an assessment of the Child. (R. 71, Well Settled Assessment of Minor Child.) She found that the Child was developing normally for a child her age. (*Id.* at 5.) She also stated that Polish is the Child's primary language, but that the Child could speak a few words in English, including counting to ten, colors, and animals. (*Id.*) The Child also appeared to have a close relationship with her mother, grandmother, her aunt, and her two cousins. (*Id.* at 4.) The social worker concluded that the Child appears stable, safe, and happy in her current environment. (*Id.* at 6.)

## CONCLUSIONS OF LAW

The purpose of the Hague Convention is to address the problem of international child abductions during domestic disputes. *Abbott v. Abbott*, 130 S.Ct. 1983, 1987 (2010) (citing the Hague Convention, art. 1). The Convention's provisions were drafted to respond to the scenario

in which one person, usually a parent, removes a child to, or retains a child in, a country that is not the child's habitual residence in order "to obtain a right of custody from the authorities of the country to which the child has been taken." Elisa Pérez-Vera, *Explanatory Report*, ¶ 13 Hague Conference on Private International Law, Acts and Documents of the Fourteenth Session, Child Abduction 426, (1982) (hereinafter, "Pérez-Vera Report").[3] The Convention thus aims "to ensure that the rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States" by securing the "prompt return of children wrongfully removed to or retained in any Contracting State." *Abbott*, 130 S.Ct. at 1987.

Under the Convention, "a child abducted in violation of 'rights of custody' must be returned to the child's country of habitual residence," unless the party who wrongfully removed the child establishes one of the affirmative defenses identified in the Convention. *See id.* Because the Convention seeks to return the parties to the pre-removal status quo, the Court must construe all of the defenses narrowly, and even where a defense applies, the Court has discretion to order the child's return. 42 U.S.C. § 11601(a)(4); *see, e.g., Blondin v. Dubois*, 189 F.3d 240, 246 (2d Cir. 1999) ("Were a court to give an overly broad construction to its authority to grant exceptions under the Convention, it would frustrate a paramount purpose of that international agreement—namely, to 'preserve the status quo and to deter parents from crossing international boundaries in search of a more sympathetic court.'"). Importantly, "[a]n action under the Convention and ICARA is not an action to determine the merits of custody rights," *Koch*, 450

---

[3] The Pérez-Vera Report is "recognized by the [Hague] Conference as the official history and commentary on the Convention and is a source of background on the meaning of the provisions of the Convention available to all States becoming parties to it." *Koch v. Koch*, 450 F.3d 703, 711 n.4 (7th Cir. 2006). Many circuits treat the Pérez-Vera Report "as an authoritative source for interpreting the Convention's provisions." *Id.* (citations omitted).

F.3d at 711, and the Court's inquiry is limited to the merits of the abduction claim and not the merits of the underlying custody battle. *Ruiz v. Tenorio*, 392 F.3d 1247, 1250 (11th Cir. 2004). "The court's task is to simply determine which country is the proper forum for that custody determination." *Koch*, 450 F.3d at 711.

Because Petitioner has established by a preponderance of the evidence that the Child has been wrongfully removed within the meaning of the Convention, *Habrzyk*, 2011 WL 63903, at *14, the Child must be returned unless Respondent establishes one of the affirmative defenses provided for in the Convention. Respondent asserts that the Child should not be returned to Poland because the Child is settled in her new surroundings. *See* Hague Convention, art. 12. To succeed in asserting this defense, Respondent must prove that the Child is settled by the preponderance of the evidence. 42 U.S.C. § 11603(e)(2)(B). Respondent also claims that returning the Child to Poland would subject her to a grave risk of harm at the hands of Petitioner. *See* Hague Convention, art. 13(b). Respondent has the burden of proving there is a grave risk to the Child by clear and convincing evidence. 42 U.S.C. § 11603(e)(2)(A).

## I.     Respondent's "Settled" in New Surroundings Defense

The first affirmative defense asserted by Respondent is the "settled" defense. (R. 106, Resp't Mem. at 3.) The Convention provides that a child wrongfully removed must be returned if less than one year has elapsed between the date of the commencement of the judicial proceedings and the wrongful removal of the child. Hague Convention, art. 12. If the period is longer than one year, the Court need not order the child's return if "it is demonstrated that the child is now settled in its new environment." *Id.* Respondent contends that Petitioner initiated judicial proceedings more than a year after the Child was removed from Poland, and that the

15

Child is now settled in Illinois.[4]

The "settled" exception recognizes that although the primary goal of the Convention is the prompt return of wrongfully removed children, there may be some cases in which the forced return of the child might "only serve to cause him or her further distress and accentuate the harm caused by the wrongful relocation." *In re B. Del C.S.B.*, 559 F.3d 999, 1002-03 (9th Cir. 2009) (citations omitted). Because of the Convention's strong presumption of return, however, "the U.S. State Department has declared that 'nothing less than substantial evidence of the child's significant connections to the new country is intended to suffice to meet the respondent's burden of proof.'" *Id.* at 1003 (quoting Department of State, *Hague International Child Abduction Convention: Text and Legal Analysis*, Pub. Notice 957, 51 Fed. Reg. 10494, 10509 (1986) (hereinafter "Dept. of State, *Text and Legal Analysis*")). Thus, the passage of time alone or minimal evidence of ties to the new environment are insufficient to prove a child is "settled" under the Convention. Instead, "there must also be evidence that the [child is] in fact settled in or connected to the new environment so that, at least inferentially, return would be disruptive with likely harmful effects." *In re Robinson*, 983 F. Supp. 1339, 1345 (D. Colo. 1997).

The factors courts consider in determining if a child has "significant connections" to the new country include: "(1) the child's age; (2) the stability and duration of the child's residence in

---

[4] Petitioner admits that he filed the petition more than one year after the Child was removed from Poland, but argues that the Court should toll the Convention's filing period. (R. 102, Pet'r Mem. at 16.) He claims that Respondent concealed the location of the Child, and other circuits have recognized that equitable tolling principles should apply to the "settled" exception under the Convention when concealment of the child's location caused the delay in the filing of the petition. (*Id.*) Petitioner alternatively argues that Respondent has not met her burden of showing that the Child is settled under the requirements of the Convention. (*Id.* at 26.) Because the Court finds that Respondent has not established by the preponderance of the evidence that the Child is settled in Illinois, the Court declines to address the tolling argument.

the new environment; (3) whether the child attends school or day care consistently; (4) whether the child has friends and relatives in the new area; (5) the child's participation in community or extracurricular school activities, such as team sports, youth groups, or school clubs; and (6) the respondent's employment and financial stability." *In re B. Del C.S.B.*, 559 F.3d at 1009. While courts also consider the immigration status of the respondent and the child, "only a case in which there is an immediate concrete threat of removal can immigration status constitute a significant factor with respect to the question whether a child is 'settled.'" *Id.* at 1010.

In this case, several factors weigh in favor of finding that the Child is "settled" in the United States. First, at the time of the filing of the petition, the Child had been living in the United States for seventeen months.[5] The Convention clearly contemplates that any time over a year may be sufficient for a child to develop substantial connections to his or her new community. Second, the evidence shows that the Child is very close to her grandmother, aunt, and cousins. Third, the Child's current living situation in the apartment with her mother and grandmother appears comfortable and stable.

On the other hand, the Child's age and sheltered existence since she came to the United States weigh against a finding that the Child has significant connections to her new environment. At the time of the filing of the petition, the Child had recently turned four years old. While age alone is not dispositive in this inquiry, the younger the child is, the less likely it is that he or she is "old enough to allow meaningful connections to the new environment to evolve." *Robinson,*

---

[5] The parties previously agreed that the Court would only consider evidence pertaining to the Child's connections to Illinois in existence on the date of the filing of the petition, September 14, 2010. (*See* R. 68, Order Regarding "Well Settled Assessment" of the Child, Jan. 20, 2011.) However, even if the Court were to consider the additional activities that the Child has become involved in during the past few months—specifically attendance at Polish school once a week and singing in the church children's choir—the Court's conclusion would remain the same.

983 F. Supp. at 1345. Respondent cites cases in which children under five have been found to be settled in their new environment, but those cases are clearly distinguishable from this case. *See Muhlenkamp v. Blizzard*, 521 F. Supp. 2d 1140, 1146 (E.D. Wash. 2007) (child who was three and a half years old, with American passport and American birth certificate, determined to be "settled" in the U.S. based on hearing testimony of child's daycare provider, report that child was performing at an academic level two to three times above age group, and fact that child had "strong core" of friend); *Zuker v. Andrews*, 2 F. Supp. 2d 134, 141 (D. Mass. 1998) (child, an American citizen, who was four years and two months old, was "settled" based on child's attendance at day care for 21 months, record of thriving academically and socially, and testimony of executive director of day care center that child had established relationships with teachers, children, and other staff).

Here, in contrast to the cases Respondent relies upon, the Child has established no significant connections outside of her own immediate family. At the time of the filing of the petition, the Child did not attend school or day care. Her only involvement outside of the home was attending church once a week, and there is no evidence that the Child developed a significant connection to the congregation or the church. Respondent has also listed the first names of several children with whom the Child plays, but that evidence does not establish a level of connection to the Child's new environment comparable to the cases cited above. Instead, this case is more similar to *Blanc v. Morgan*, 721 F. Supp. 2d 749 (W.D. Tenn. 2010). In *Blanc*, the child, who was four years old at the time, lived with her mother and grandmother in a stable home, and her mother was employed by FedEx. *Id.* at 764. The child regularly attended day care, was enrolled in summer camp, and had developed bonds with her grandmother and aunt.

*Id.* Despite these connections to her environment, the district court found that there was insufficient evidence that the child was "so extensively involved in activities or has developed connections within the community such that she would suffer an undue disruption if she were returned." *Id.*

In this case, the evidence of the Child's connections to her community are even less substantial than those in *Blanc*. She has developed bonds with her grandmother, aunt, and cousins, and possibly a few neighborhood friends, but she had yet to attend school, day care, or any other outside activity at the time the petition was filed. As mentioned above, this was a conscious choice by Respondent, who did not want to expose her daughter to "strangers" after their move to Illinois. Additionally, the Child moved three times during the seventeen months between when she was removed from Poland and the filing of the petition in this case. She spent several weeks in Canada in a hotel, then lived in the home of her aunt and uncle, and then moved to the apartment in which she now resides with her mother and grandmother. This is further evidence that the Child is not "settled." *See In re Koc*, 181 F. Supp. 2d 136, 154 (E.D.N.Y. 2001) (finding that child was not "settled" despite her excellent English and academic performance because she had moved to three new schools and three new homes in less than three years, preventing her from making close friends or being involved in after-school activities).

Weighing the evidence before it, the Court concludes that Respondent has failed to put forth enough evidence that the Child has significant connections to Illinois. Respondent failed to establish the "settled" defense by a preponderance of the evidence. While the Child had spent nearly seventeen months in Illinois by the time the petition was filed, she did not establish significant connections to her new environment because of her age and the sheltered life she has

had here. The Court does not deny that the Child appears content in her current situation or that Respondent is a good mother; on the contrary, the evidence shows that the Child is developing well and is happily situated in her apartment with her mother and grandmother. Those facts, however, are more relevant to a determination of the Child's "best interests," which is a line of inquiry that is inappropriate for the Court to undertake under the Convention. The Child's return to Poland will obviously disrupt her life to a certain extent, but the evidence in this case does not show that the disruption is significant enough to overcome the strong presumption under the Convention that a wrongfully removed child should be promptly returned to his or her country of habitual resident to have custody matters decided by the authorities there.[6]

## II.       Respondent's "Grave Risk" Defense

Respondent's second affirmative defense is that returning the Child to Poland would subject her to a grave risk of harm at the hands of Petitioner. (R. 106, Resp't Mem. at 12.) Under the Convention, the Court need not order the return of the Child if "there is a grave risk that [her] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention, art. 13(b). Respondent has the burden of proving there is a grave risk to the Child by clear and convincing evidence. 42 U.S.C. § 11603(e)(2)(A). "[T]he clear and convincing standard of proof lies between beyond a reasonable

---

[6] This conclusion is also informed by two additional considerations. First, the Child speaks Polish as her first language, and only knows a few words in English. While this fact does not necessarily weigh against a finding that she is settled in Illinois, that the Child speaks Polish does indicate that her return to Poland would be less likely to cause her harm or "undue disruption." Additionally, the Child has a large family in Poland, including her paternal grandmother, her maternal grandfather, and cousins. *See* Dept. of State, *Text and Legal Analysis*, 51 Fed. Reg. 10494, 10509 ("[A]ny claims [that the child is settled] made by the person resisting the child's return will be considered in light of evidence presented by the applicant concerning the child's contacts with and ties to his or her State of habitual residence.").

doubt and a preponderance of the evidence." *Matter of Rose*, 934 F.2d 901, 904 (7th Cir. 1991)

(citing *Addington v. Texas*, 441 U.S. 418, 425 (1979)). The Second Circuit has characterized the

"grave risk" exception as follows:

> At one end of the spectrum are those situations where repatriation might cause inconvenience or hardship, eliminate certain educational or economic opportunities, or not comport with the child's preferences; at the other end of the spectrum are those situations in which the child faces a real risk of being hurt, physically or psychologically, as a result of repatriation. The former do not constitute a grave risk of harm under Article 13(b); the latter do.

*Blondin*, 238 F.3d at 162. To succeed in asserting this defense, Petitioner must put forth

"specific evidence of potential harm to the child upon [her] return." *Baxter*, 423 F.3d at 374.

In this case, Respondent claims that Petitioner was physically and emotionally abusive

towards her and the Child, and that they would be at grave risk of physical and psychological

harm if the Child is returned to Poland. There is no question that the "grave risk" affirmative

defense can be established by credible evidence that returning a child to his or her country of

habitual residence will risk exposing the child to frequent and serious domestic abuse. *See Van*

*de Sande*, 431 F.3d at 571 (reversing order of return at summary judgment phase where mother

alleged that the father had frequently and severely beaten the mother, one of the children, and

also threatened to kill them). In *Van de Sande*, the Seventh Circuit made clear that "[i]f handing

over custody of a child to an abusive parent creates a grave risk of harm to the child, in the sense

that the parent may with some nonnegligible probability injure the child, the child should not be

handed over[.]" *Id.* While noting that "[c]oncern with comity among nations argues for a

narrow interpretation of the 'grave risk of harm' defense," the Seventh Circuit emphasized that

"the safety of children is paramount." *Id.*

As alluded to in *Van de Sande*, the Court notes that allegations of domestic abuse highlight several of the inherent tensions in the Convention, and in the "grave risk" defense specifically. On the one hand, Respondent must prove that there is a "grave risk" that returning the Child would expose her "to physical or psychological harm" by "clear and convincing evidence." Art. 13(b); 42 U.S.C. § 11603(e)(2)(A). As noted above, however, domestic violence usually occurs behind closed doors, with few or no witnesses. Thus, in the case of allegations of domestic abuse, it may be difficult for a parent asserting the "grave risk of harm" defense to meet his or her burden by "clear and convincing evidence" when the allegations are difficult to prove by their very nature.

In this case, while recognizing the tensions between the burden of proof required for the "grave risk" defense and the availability of proof in domestic abuse cases, the Court concludes that that Respondent has failed to show "some nonnegligible probability" that Petitioner will injure the Child if she is returned to Poland. As Respondent admits, her evidence of abuse "comes largely from her own testimony," (R. 106, Resp't Mem. at 16), and the Court has found that Respondent's testimony pertaining to the allegations of abuse was inconsistent, unsubstantiated, and directly contradicted by the testimony of several neutral parties.[7] Given this finding, the evidence put forth by Petitioner in support of this claim is substantially less than in other cases in which the "grave risk" defense was successfully established with evidence of domestic abuse. *See, e.g., Van de Sande v. Van de Sande*, No. 05 CV 1182, 2008 WL 239150, at *10-11 (N.D. Ill. Jan. 29, 2008) (on remand from the Seventh Circuit, finding that mother

---

[7] The Court notes that it found Respondent's allegations of abuse of both her and the Child exaggerated and less than candid. Thus, Respondent's argument that a child is at a greater risk of harm when he or she is in contact with a spousal abuser, (R. 106, Resp't Mem. at 13), is inapposite as the Court did not find Petitioner to be a spousal abuser.

established "grave risk" defense where mother presented affidavits of five witnesses that painted "a consistent and disturbing picture" of physical and verbal abuse, husband threatened to kill the children in the presence of witnesses, instances of abuse were reported to the police, and the court had no reason to question the mother's version of events); *Application of Blondin v. Dubois*, 78 F. Supp. 2d 283, 286 (S.D.N.Y. 2000) (finding that mother established "grave risk" defense based on her own testimony, evidence that mother and children had twice resided in shelter for battered women prior to fleeing from France, and medical records that documented the many injuries suffered by the mother). Accordingly, because Respondent has failed to put forth credible evidence—let alone clear and convincing evidence—in support of her allegations that the return of the Child would put her at grave risk of harm at the hands of Petitioner, the Court concludes that Respondent has failed to meet her burden in asserting the "grave risk" defense.

The Court does not doubt that Petitioner has been neglectful of his duties as a father at times. However, whether Petitioner or Respondent is the better parent is not a relevant line of inquiry for this Court. The "grave risk" exception "is not license for a court in the abducted-to country to speculate on where the child would be happiest." *Friedrich v. Friedrich*, 78 F.3d 1060, 1068 (6th Cir. 1996). "It is not relevant to this Convention exception who is the better parent in the long run, or whether [Respondent] had good reason to leave her home in [Poland] and terminate her marriage[.]" *Nunez-Escudero v. Tice-Menley*, 58 F.3d 374, 377 (8th Cir. 1995). Under ICARA and the Convention, these issues are expressly reserved for the courts in Poland, where proceedings have been initiated by Petitioner. The Convention and ICARA, as well as this Court, presume that the courts in Poland will fully protect the best interests of the Child during and after the pending custody proceedings.

Finally, the Court notes that Petitioner has agreed to comply with any "undertakings," or conditions on the return of the Child, that the Court deems necessary. (R. 102, Pet'r Mem. at 14-15.) The Seventh Circuit has recognized that courts can consider whether making a return contingent upon "undertakings" from a petitioner "would ameliorate any short-term harm to the child." *Van de Sande*, 431 F.3d at 571 (citations omitted). As undertakings, Petitioner has proposed that the Court order: (1) the Child to remain in the custody of Respondent until the Polish Courts make a custody determination; (2) that Petitioner be granted frequent visitations with the Child; and (3) that Petitioner file the undertakings with the Polish Court and Polish Central authority to make the undertakings enforceable in Poland. (*Id.* at 15.) The Court finds that the proposed undertakings are reasonable and advisable given the Child's young age and minimal contact with Petitioner over the last two years, and will impose them as a condition of her return. To date, Respondent has rejected all of the proposed undertakings in the hopes of "winning" this case. (R. 109, Resp't Mem. at 15.) However, the Court regrettably concludes that there are no real winners in this sad dispute. The undertakings require Respondent's cooperation, and it is the Court's hope that this cooperation will be forthcoming in view of this opinion. It is this Court's hope that the parties can expeditiously resolve all the details surrounding the Child's return to Poland in a manner that provides the Child with a transition back to Poland that is as minimally disruptive as possible, and in the long run, ensures the stable and supportive environment she deserves. The Child deserves nothing less.

## CONCLUSION

For the foregoing reasons, the Court finds that Respondent has failed to meet her burden of establishing either the "settled" or "grave risk" defenses under the Convention. Accordingly,

because the Court previously concluded that Respondent wrongfully removed the Child from Poland in violation of the Convention, the Court finds that the Child must be returned to Poland and grants Petitioner's Petition for Return of the Child (R. 1). This conclusion, however, does not speak to the merits of the underlying custody dispute, which ICARA and the Convention mandate must be resolved in Poland.

The Clerk of the Court is directed to enter final judgment in this lawsuit in favor of Petitioner and against Respondent. Each side will bear their own costs. The Court will pay Ms. Smith for her professional report from the special funds available for court-appointed counsel. The parties are given until April 22, 2011 to submit a proposed final order in this case. The Court will retain jurisdiction to fully enforce this final judgment.

The Court expressly commends the pro bono and appointed counsel in this case for their skillful representation of the parties and their thorough and well-written briefing of the issues. The Court is particularly appreciative of the expedited manner in which counsel handled this sensitive and important matter.

**Entered:**

**Judge Ruben Castillo**
**United States District Court**

**Dated:** April 7, 2011

25